In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3772

JUANITA JORDAN,

*Plaintiff-Appellant,*

*v.*

CITY OF GARY, INDIANA and
DONALD THOMPSON,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:01-CV-323-TS—**Theresa L. Springmann**, *Judge.*

ARGUED MAY 26, 2004—DECIDED JANUARY 28, 2005

Before BAUER, POSNER and COFFEY, *Circuit Judges.*

COFFEY, *Circuit Judge.* Juanita Jordan filed a complaint
on May 2, 2001 in federal court against her former em-
ployer, the City of Gary, Indiana, and her former supervisor
Donald Thompson alleging sex discrimination and harass-
ment in violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e et seq., age discrimination in violation of
the Age Discrimination in Employment Act ("ADEA"), 29
U.S.C. § 621 et seq., as well as defamation of character and

violation of her freedom of speech. Following the defendant's motion for summary judgment, the district court, Judge Theresa Springmann presiding, found as a matter of law that Jordan failed to present sufficient evidence as to any claim which would warrant a trial. The district court granted the defendants' motion for summary judgment and entered judgment in their favor. We affirm.

## I.  Background

Juanita Jordan, a 60-year-old African-American female, was employed by the City of Gary, Indiana, Division of Health and Human Services ("HSS") Health Clinic for 15 years, from June 1, 1984 until the date of her termination on July 8, 2000.[1] Jordan joined the Gary Health Department ("GHD") as a switchboard operator and through the years was promoted a number of times, eventually attaining the position of Senior Disease Intervention Specialist ("DIS II"), which she held at the time of her discharge. As a DIS II, Jordan contacted individuals infected with either syphilis or HIV, arranged testing and treatment for them and their infected, or potentially infected, partners and counseled them on a number of disease-related matters. To qualify for that position, Jordan, 58 at the time of her termination had earned a degree in psychology from Purdue University Calumet in 1978 and had attended regular continuing education classes and seminars.

Throughout most of her tenure at the HSS, the record establishes that Jordan was a distinguished and dedicated employee. Indeed, for two consecutive years, in 1988 and 1989, Jordan was named the best Disease Intervention

---

[1]  In a letter dated August 28, 2000 Jordan was informed of her termination, the effective date of which was identified as July 8, 2000.

Specialist in the State of Indiana. In addition, Jordan was considered to be a valuable resource at the HSS by a number of her colleagues and supervisors. However, beginning in 1993, and continuing until her termination in 2000, a number of rather serious flaws began to manifest themselves in Jordan's work history as a model employee.

From 1993 to 1999 Jordan was disciplined on a number of occasions for violations of the City of Gary work rules and policies, some very serious (*e.g.*, failing to report to work and using the city's property without permission). These violations resulted in various types of reprimands, referral to a counselor under the City of Gary's Employee Assistance Program, and even suspension from her duties without pay.[2] For example, on or about June 24, 1997, in a conversation with a client, Jordan began belittling and badgering him over the telephone. According to the record, when the client failed to recall some specific information that Jordan requested she (Jordan) became abusive, calling him a "mur-

---

[2] In 1993 Jordan was cited twice for work rules violations; in January of that year she was reprimanded in writing for failing to attend a mandatory meeting and in August of the same year she was suspended for one day without pay (and her city vehicle privileges were suspended for ninety days) for using a vehicle without authorization. In March of 1995 Jordan was reprimanded in writing for being absent from work without permission (apparently Jordan was habitually returning from lunch late). Eighteen months later, in October of 1996, Jordan received a verbal warning that she had excessive absences and was eligible for disciplinary suspension pending termination. Also, in October of 1998, Jordan was referred to counseling after she helped initiate a physical confrontation between two clients in the mens room of the clinic. Her supervisor described this incident as "against all protocol." Tr. Exh. 28. In a memo, the Administrator of the Health Department, Helen Smith, observed that "Ms. Jordan's obvious lack of comprehension, grandiose attitude and unwarranted anger yield some serious concerns related to the state of her mental health." *Id.*

derer," and hanging up. Tr. Exh. 25. This resulted in Jordan's suspension without pay for three days, effective June 24, 1997. However, in an act of defiance, Jordan returned to work the following day, in spite of the suspension order, and as a result an additional day was added to her suspension. In addition, she was also required to consult an Employee Assistance Program counselor before returning to work.

In October of 1999, allegedly under pressure from the Gary, Indiana Mayor's office, changes in the HSS department were initiated.[3] Donald Thompson, the Division Director of the HSS, claims he was directed to get to the bottom of some alleged breaches of confidentiality and other deficiencies manifested by staff members within the department. As part of this initiative, Thompson enlisted the help of the HSS Health Clinic Manager at the time, Aleisa James (Jordan's supervisor from 1992-2000) and instituted a number of changes in the department such as a new policy requiring that, going forward, all DISs would be required to hold a medical assistant certification, unless they were licensed professional nurses. Also, in February of 2000 Thompson announced his intention to have the entire staff re-apply for their positions.

Shortly thereafter, in March of 2000, Aleisa James, the Clinic Manager and Jordan's supervisor, announced that she would be taking approximately six weeks of medical leave. James suggested to Thompson that Jordan and another employee, Roland Carey, II, be assigned to split the

---

[3] In deposition testimony Thompson testified that in October of 1999 the HSS was placed on a 90-day period of probation by the mayor's office. Jordan contends that the probation was actually instituted a year later, in October of 2000. However, the timing of the actual probation period is ancillary to our decision here (as it was to the district court) and, therefore, is not a triable issue of material fact.

time that she would be on leave as acting Clinic Manager. However, because Thompson had doubts about Jordan's abilities to take orders and follow directives, he instead named Deputy Director of Health, Ida Parker, 55, as James' replacement as the ranking officer in the HSS Health Clinic. In addition, Carey, 37, was named supervisor/lead case management person, based on "his previous working relationship with Aleisa James and his case management skills." Carey's role was to coordinate the case management activities of the clinic (*i.e.*, assign and manage the handling and completion of cases on a day-to-day basis) and to report on a daily basis to Ida Parker (who in turn reported to Thompson as Director of the HSS).

Following Carey's installation as supervisor, Jordan's instances of insubordination and insolence escalated. The week of May 8, 2000, Jordan was late returning from lunch on three consecutive days and was issued a written warning on May 12. Also on Friday, May 12, 2000 Jordan was disciplined for breaching the City's dress code policy when she wore a head covering to work. After being ordered to remove the article, she complied; however, the following Monday Jordan returned to work wearing the same head covering and was suspended for three days for insubordination. In addition, on May 25, 2000 Jordan was once again suspended, this time for five days, for leaving the building without permission in order to discuss a grievance she had filed with the City's human resources department regarding the head covering incident. In a further act of defiance, during her suspension from work for being absent without leave, Jordan was identified on the Health Clinic property without authorization and was escorted from the property by security after being informed that she was not to be on the property while suspended.[4]

---

[4] After Jordan returned from her suspension, Thompson was
(continued...)

Reacting to the pattern of unacceptable behavior described above, Thompson, in conjunction with his deputy, Ida Parker, informed Jordan that she would be suspended until July 5, 2000, demoted (with a corresponding $1,500 decrease in salary) and be placed on 90-days probation, after which the status of her continued employment would be reviewed. On July 5, 2000, Jordan failed to report for work or to notify her supervisors that she would be absent. Although Jordan filed a grievance the following day with the City of Gary regarding the suspensions and demotion she had received— in which she also alleged a pattern of harassment—she persisted in her insubordination by failing to report for work over the next two weeks. On July 19, 2000, Thompson sent Jordan a certified letter informing her that she was absent without leave and advising her of the fact that a recommendation for her termination had been forwarded to the City's human resources department. Jordan's dismissal from the Health Department became final effective July 8, 2000.[5] In response, Jordan filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2000, alleging discrimination on the basis of sex and age as well as failure to promote, which was denied. Jordan was subsequently issued Notice of Right to Sue by the EEOC in February of 2001.

Jordan filed a pro se complaint on May 2, 2001, in the

---

[4] (...continued)
notified of a complaint lodged against Jordan alleging that she had breached the HSS's confidentially agreement by relaying sensitive and confidential information about a patient to his mother without the patient's permission.

[5] Jordan's termination was effective July 8, 2000 pursuant to City of Gary Policy Manual work rule A-19 which mandates that "[n]o employee shall be absent for three consecutive work days or more without notifying his/her supervisor." Tr. Exh. 17.

United States District Court for the Northern District of Indiana, alleging that the City of Gary and Thompson discriminated against her on the basis of her sex, in violation of Title VII and her age, in violation of the ADEA. Specifically, Jordan claimed that Thompson discriminated against her on the basis of her sex and age when he selected, James, a 55-year-old female, and Carey, a 37-year-old male, to assume James' responsibilities instead of promoting her (Jordan herself was 60 years old at the time). In addition, Jordan claims that she was also discriminated against on the basis of both her age and sex when she was disciplined various times in May of 2000, demoted and terminated in July of that year. Jordan also included a surprising claim that she was "constructively discharged" by Thompson when she had no other recourse but to not return to work following her final suspension and demotion, thereby causing her termination.

On February 14, 2003, after discovery had been conducted, the defendants moved for summary judgment and the district court agreed granting the motion to dismiss. Proof of discrimination may be found under either the direct or indirect method. The trial judge concluded that, under the direct method of proof, Jordan had failed to establish that Thompson had intentionally discriminated against Jordan because she was an older female. In addition, under the indirect method the court found that, assuming Jordan had made out a prima facie case of age and sex discrimination regarding her failure to promote claim, she had failed to establish that Thompson's reasons for promoting Carey (*i.e.*, that he believed Carey would be a better candidate due to his managerial skills and his lack of a derogatory discipline record), was pretextual. As to her claim that she had been discriminatorily disciplined, demoted and subsequently terminated, the court found that Jordan had failed to identify a similarly situated male employee in the department under the age of 40 who was treated less favorably. *See Grayson v. City of Chicago*, 317 F.3d 745, 817-18 (7th

Cir. 2003) (Title VII); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002) (ADEA). In addition to failing to produce a similarly situated employee, the judge found that Jordan had brought forward "no credible evidence" suggesting either her discipline or demotion was based on her age or sex and therefore this claim, as well as her constructive discharge claim, must fail as a matter of law.[6] On appeal Jordan argues that the district court erred in granting summary judgment to the defendants on her Title VII and ADEA claims.

## II. Analysis

"We review a district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to the nonmoving party." *Williams v. Waste Mgt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir. 2004). In addition, summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Under Title VII it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. In addition, the

---

[6] In addition, Jordan claimed that the defendants had sexually harassed her, violated her First Amendment rights to free speech and defamed her. The district court granted summary judgment as to these claims finding that they lacked any merit. Because Jordan does not challenge the district court's decision to grant summary judgment, and they are not properly before us on appeal, we see no need to discuss them here.

ADEA provides that it is unlawful for any employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In resisting summary judgment under Title VII, a plaintiff has two available methods of proving retaliation: the "direct" and "indirect method." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003).

## A.  Jordan's Claims Under the Direct Method

To prove discrimination via direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited amicus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). It should not be surprising that in today's politically correct workplace environment such admissions are rarely, if ever, made or encountered. *See id.* Therefore, a plaintiff may also "prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Nonetheless, under the direct method, circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Jordan argues that circumstantial evidence concerning Thompson's disparate treatment of two other older women—Geraldine Steele, 62, and Pearlena Hammond, 65—at the Gary Health Department evinces his discriminatory state of mind and would allow us to infer his intent to discriminate against her. Jordan alleges that Thompson intentionally required Steele and Hammond to work together despite his knowledge that there was latent animosity between the two. Also, Jordan claims that, in order to make things tougher

on these women, Thompson rearranged their lab without informing them prior to doing so, denied them budgeted salary increases, treated them rudely and eventually transferred one of them, Steele, to a "trivial job" without cause. While we feel inclined to acknowledge that the circumstances described by Jordan are indeed suspect, and under other conditions may induce a finding of discriminatory intent on Thompson's part, they did not occur in a vacuum; rather, they took place at a time when the Department was undergoing managerial, as well as structural, changes which undoubtedly frustrated and confused a number of employees.

During the time period in which Jordan claims that she (as well as the other women) were discriminated against, conditions in the HSS and the Health Clinic were in a state of flux. As mentioned above, Thompson was in the process of instituting a number of changes to improve the functionality and professionalism in the division. Although it is true that Steele, Hammond and Jordan were required to undergo changes in their routines that may have been distasteful to them, other employees were also required to make adjustments. For example, Jodie Pryor, a 37-year-old female was terminated and three other females, Kimberly Peterson, 35, Tracey Roberts, 39, and Joanna Grimes, 52, all left the HSS during this period. This is not to mention the fact that Aleisa James, who was replaced by Ida Parker and Roland Carey, was not given her former position back after she returned from her leave of absence. The circumstances Jordan cites certainly describe a working situation which was anything but stable. In addition, the record certainly suggests that Thompson was not making many friends through his management style and the reorganization policies that he was instituting. Nevertheless, we are unpersuaded that the circumstantial evidence which Jordan points to under the direct method, especially when one considers the fact that the Health Clinic was in a period of transition, would allow a reasonable jury to infer intentional discrimination on

Thompson's part. *See Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004).

*B. Jordan's Claims Under the Indirect Method*

A plaintiff that has failed to establish discriminatory intent under the direct method may nonetheless ultimately prevail under the indirect, burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to survive a motion for summary judgment under the indirect method, Jordan must initially establish, by a preponderance of the evidence, a prima facie case of discrimination. Thereafter, it is incumbent upon the defendants-appellees (the "City") to counter with a legitimate, nondiscriminatory and nonpretextual reason for the employment action. This method of analysis is applicable whether the discrimination alleged is on the basis of sex, when proceeding pursuant to Title VII, or on the basis of age, under the ADEA. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2001).

1. Jordan's Failure to Promote Claim

Jordan alleges that the decision not to promote her to both the manager position (to which Parker was appointed) and the supervisor position (Carey) in the Health Department was discriminatory in nature. In addition, she contends that she has established a prima facie case of discrimination[7] and that she has also successfully demonstrated that the justification for not promoting her offered by the City is

---

[7] In the district court's Memorandum of Decision and Order, Judge Springmann makes clear that, for the sake of brevity, the court "assumed, without deciding," that Jordan had made out a prima facie case and moved right to Jordan's pretext arguments.

pretextual, contrary to the findings of the trial judge. We disagree.

In order to establish a prima facie case of sex or race discrimination for failure to promote Jordan would have to establish, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was rejected for the position sought; and (4) the position was granted to a person outside the protected class who is similarly or less qualified than Jordan. *See Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003), *accord McDonnell Douglas*, 411 U.S. at 802-03.

The first prong of Jordan's argument is that she should have been promoted to the position of Health Clinic manager rather than Parker. In order to establish a prima facie case of discrimination for failure to promote under the *McDonell Douglas* framework, Jordan is required to identify a person *outside* the protected class of which she is a member that was given the job instead of her. *See id*. However, it is undisputed that Parker is an African-American female over the age of 40. Therefore, because Parker is a member of the same protected class as Jordan, Jordan is precluded from successfully arguing that she was unfairly discriminated against when Thompson chose to assign Parker as the head of the Health Clinic instead of her. Stated differently, Jordan had failed to establish a prima facie case of discrimination under the *McDonnell Douglas* framework as to this prong of her failure to promote claim. *See, e.g., Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000).

In the second prong of her failure to promote claim Jordan also argues that she should have been awarded the Health Clinic supervisor position instead of Carey. While Carey, unlike Parker, is outside of Jordan's protected class, our analysis does not end there. In addition to identifying a person outside the protected class, Jordan must also

establish that the person promoted in her place was similarly situated at the time of the alleged discrimination against her. *Grayson*, 317 F.3d at 748. In order for Jordan to establish that a fellow employee, like Carey, is a similarly situated person Jordan must demonstrate that Carey occupied the same job level and engaged in similar past misconduct, but as a result of his misconduct he (unlike Jordan) was treated differently (*i.e.*, more favorably) for no legitimate reason. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939-40 (7th Cir. 2003). The record establishes that Jordan had an extensive track record of repeated and ongoing disciplinary problems prior to Thompson's decision to appoint Carey as supervisor, while Carey did not. Indeed, Jordan has introduced no evidence into the record that would suggest that Carey had *ever* committed a work rules violation or even a breach of protocol while employed at the GHD. Therefore, Carey cannot be considered a "similarly situated person" within the meaning of *McDonnell Douglas* and Jordan has failed to establish a prima facie case of discrimination under this prong of her failure to promote argument as well. *See id.*

However, even if we were to assume, as did the trial court, that Jordan has made out a prima facie case under this prong of her argument, she has failed to establish that the legitimate business justification proffered by the defendants-appellees is pretextual. In order to meet her burden of proving that the City's justification for promoting Carey in place of Jordan is pretexutal, she is required to establish that the City's "explanation [was] designed to obscure the unlawful discriminatory employment action." *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir. 1996). What's more, in order to establish pretext, Jordan must establish that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in

question," which she has failed to do. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (internal quotations omitted).

The record establishes that Carey's qualifications for the supervisor (and later Health Clinic Manager) roles in the Health Clinic were objectively comparable, if not superior, to those of Jordan. Carey was at the same job classification level, DIS II, as Jordan at the time he was named supervisor. In addition, there is a wealth of un-refuted testimony in the record that suggests that Carey was a more desirable employee than Jordan despite his lack of relative job experience. For example, in support of his decision to name Carey acting supervisor, Thompson stated that his choice was "based . . . on his previous working relationship with Aleisa James and his case management skills." In addition, James stated that when she was preparing to go on medical leave she was going to appoint Carey acting supervisor for three weeks due to his *organizational skills*; the very same reason Thompson gave for promoting him. Also, the Deputy Director of Health (and James' superior) stated that she "approved the appointment of Roland Carey, II, as the appropriate candidate to assist with the ongoing case management," and that the choice "was based solely on his case management skills." Parker Aff. ¶¶ 9, 10. This evidence, when viewed in conjunction with Jordan's lengthy and repetitive record of insubordination and violation of work rules, demonstrates that it was entirely reasonable for Thompson to conclude that Carey was the *only* qualified candidate for the position of acting supervisor and later Director of the Health Clinic. Indeed, Jordan has failed to establish that she was even *as qualified* as Carey for the position, much less "so superior" a candidate that the only reason for the denial of the promotion was discriminatory in nature. *See Millbrook*, 280 F.3d at 1181.

Thus, because the evidence in the record clearly establishes the fact that Parker is a member of the same protected

class, and that Carey was not a similarly situated person to Jordan within the meaning of Title VII or the ADEA, and because Jordan has failed to establish that the City's justification for discharging her was pretextual, the district court's grant of summary judgment in favor of the City on Jordan's failure to promote claim falls far short of constituting a reversible error.

2. Discriminatory Discipline

Jordan also argues she was being unlawfully discriminated against when she was disciplined on three separate occasions, outlined in detail above, for: (a) wearing a head covering after being warned not to on May 12, 2000; (b) being absent from work without leave on or about May 25, 2000; and (c) allegedly disclosing confidential information to the mother of a client sometime prior to May 26, 2000. The district court found that because Jordan failed to identify a similarly situated employee outside her class who was treated more favorably, the City's motion for summary judgment was warranted as to this element of her claim as well. We agree.

In order for Jordan to successfully claim that she was disciplined for a prohibited discriminatory reason she must establish that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate work expectations; (3) she suffered an adverse employment action; and (4) that other, similarly situated, substantially younger, male employees were treated more favorably. *See Grayson*, 317 F.3d at 817-18; *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002) (ADEA). In her brief, Jordan briefly addresses why she believes she has satisfied most of the elements of a prima facie case for discrimination, but she has overlooked one very important factor: she has failed to supply us with an example of a similarly situated

employee outside of her protected class who was treated differently.[8]

The only person that Jordan identifies who might be considered a similarly situated employee is Carey. However, on a number of occasions this court has made it clear that in order to be considered similarly situated an employee must be "directly comparable in all material respects." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004), *accord Patterson v. Avery Dennision Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This court does not sit as a super-personnel department that re-examines an entities business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Carey was promoted to acting supervisor of the Health Clinic on or about March of 2000, prior to any of the alleged incidents of discrimination described by Jordan (which begin with her being disciplined a number of times two months later in May of 2000). Therefore, because Carey was her superior at all times relevant to this facet of Jordan's claim, and because we have held that Carey's promotion was not itself an act of discrimination, Carey cannot be considered to be "similarly situated" and Jordan's claim must fail. *See Ajayi v. Aramark Business Servs., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003).[9]

---

[8] Instead, Jordan extolls her virtues as an employee, points to three other older women in the Health Clinic whom she believes were discriminated against and eludes to Carey receiving the promotion in her place as based on a prohibited amicus, while downplaying her repeated insubordination and violation of work rules. However, other examples of alleged discrimination are superfluous to building a prima facie case and Carey cannot be considered a similarly situated employee under Title VII and the ADEA.

[9] Furthermore, even if we were to assume that Jordan had made out a prima facie case for discrimination, the City would still be

(continued...)

## C. Constructive Discharge

In her third assignment of error Jordan claims that, in addition to being unreasonably disciplined and passed over for a promotion, she was constructively discharged due to

---

[9] (...continued)
entitled to summary judgment because Jordan cannot demonstrate that any of the reasons given for her discipline were pretextual. In the first incident, where Jordan reported to work with an unauthorized head covering a day following being ordered not to wear such an article, Jordan claims that there was no rule against wearing head coverings and that others had worn them regularly. However, Jordan was disciplined for not following a legal order from a superior and insubordination regardless of what the rules and regulations were at the time. Next, Jordan claims that she was suspended for filing a grievance with the city, but the record establishes differently. The memorandum sent to Jordan apprising her of her suspension for this incident demonstrated that she was disciplined for "leaving the workplace without proper notification to supervisor." Jordan admitted that she committed this infraction and that she did not notify a supervisor; therefore, the reprimand was for a valid, nonpretextual reason. Finally, Jordan claims that she was unfairly disciplined for an alleged incident of breaching confidentiality where she allegedly informed a client's mother that he had syphilis. Indeed, she claims that because she was on suspension when the unsubstantiated complaint was received, there is no way she could have been the one that committed the infraction. In addition, Jordan posits that because she was not apprised of the anonymous complaint until weeks later, it must have been a fabrication. However, this is antithetical due to the fact that complaints are often made days or weeks after an incident occurs (in this case the mother may not have even told the son about the incident until days later) and it would be prudent for the department not to immediately act on such a complaint without first investigating the veracity before confronting Jordan.

the "significant harassment" she was subjected to in the months leading up to her termination. The trial court concluded that Jordan had failed to raise a genuine issue as to any material fact regarding the alleged intolerable conditions Jordan endured and further made findings that her discipline, demotion and subsequent termination did constitute a rational claim for constructive discharge. We agree.

Constructive discharge occurs when an employee is so mistreated at work that a "reasonable person in that employee's position would be forced to quit." *Williams v. Waste Mgt. of Illinois*, 361 F.3d 1021, 1032 (7th Cir. 2004) (citing *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)). In this regard Jordan's claim on this count is incredible, for in her own affidavit testimony Jordan acknowledges that she was fired. As noted above, in addition to her previous insubordination (*i.e.*, being absent without leave and not adhering to the Health Clinic's working hours policy) Jordan was terminated because she failed to return to work as ordered after being suspended from her duties at the Health Clinic for being absent without leave, a fact which Jordan does not dispute.[10] Indeed, Jordan unequivocally states that "[o]n August 28, I was sent a letter saying that I had been **terminated** for being absent and not notifying my supervisor. My employment with the city [sic] of Gary was **terminated** effective July 8, 2000." Jordan Aff. ¶ 32. We can make it no plainer than to reiterate that constructive discharge "refers to a situation in which an employee is not fired but quits." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (quoting *Robinson v. Sappington*, 351

---

[10] The termination letter states that Jordan was "given notification to return to work on July 5, 2000," and that because she "did not report to work nor did [she] communicate with the divisional office . . . [her] employment as a disease intervention counselor [would] be terminated." July 19, 2000 Letter from Thompson to Jordan.

F.3d 317, 336 (7th Cir. 2003)), *accord Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1993).

### III.  Conclusion

The decision of the district court is

AFFIRMED.

A true Copy:

    Teste:

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*