In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3772

GEORGE JACKSON,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3654—**Matthew F. Kennelly,** *Judge.*

SUBMITTED NOVEMBER 3, 2008*—DECIDED JANUARY 13, 2009

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* George Jackson contends that the City of Chicago discriminated against him by denying him two promotions he sought in 2004. The district court granted summary judgment for the City and Jackson appeals.

* We granted the parties' motion to waive oral argument, so the case is submitted on the briefs.

Jackson, an African-American man in his fifties, began his employment with the City of Chicago in 1987 as a carpenter in the Public Works Department. Since August 2003 he has been a foreman of carpenters in the Department of Transportation. In 2004, the City posted an announcement for two positions as general foreman of general trades—one in the Department of Transportation and the other in the Department of General Services. The general foreman of general trades coordinates the activities of all the trade unions on a given project.

Jackson and a man named Michael Blake applied for the position in the Department of Transportation. When the job was posted, Jackson had 30 years of experience as a journeyman carpenter. Prior to his employment with the City, Blake worked at a construction company, beginning as a laborer/apprentice but becoming a journeyman carpenter through the sponsorship of the carpenters' union. In the interview for the job, the candidates were asked about their experience estimating the materials and manpower needed to complete a project. Blake had relevant experience, and Jackson acknowledged to the interviewers that he did not. In fact, though it apparently did not come up at the interview, Jackson had estimated jobs while working for the Chicago Housing Authority.

Because written communications skills are important for the position of general foreman, the job selection process also involved a test of those skills. Each candidate wrote a narrative answer describing how he would replace a deck. There also were questions, for which there were objectively correct answers, testing each candidate's

ability to read and interpret drawings and blueprints. Numerical scores on a 5.0 scale were assigned to the answers: Blake's score was a near-perfect 4.75 and Jackson's was 2.25. Blake got the job.

The second position, general foreman of general trades in the Department of General Services, drew several candidates including Jackson, a man named Kevin O'Gorman, and a number of others for the spot. This time, as part of the interview process, candidates were required to complete a written work sample, which included questions relating to carpentry skills as well as personnel matters that a general foreman would be expected to handle. All the candidates except Jackson submitted the sample. Jackson denies that candidates were asked to complete a written work sample. He says that the City "has produced no evidence that a work sample was given as part of the interview process." The City, on the other hand, submitted an affidavit from David Donovan, who at the time was the assistant commissioner, Bureau of Trades & Engineering, in the Department of General Services. He was one of the interviewers for the position. Donovan said that all the candidates completed the sample except for Jackson, who refused.

O'Gorman received the highest combined score on the work sample and the interview. He was the one promoted.

Jackson filed this case alleging race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), and the Age Discrimination in Employment Act, 29 U.S.C. § 626(c). He appeals the grant of summary judgment for the City on the Title VII race

discrimination claim only. We review a grant of summary judgment *de novo. Harrell v. U.S. Postal Service*, 445 F.3d 913 (7th Cir. 2006).

Jackson has proceeded under the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To succeed, he must first establish a prima facie case of discrimination. If he does so, the City must articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the City succeeds, the burden of production shifts back to Jackson to prove that the stated reason for the adverse action was pretextual. To establish a prima facie case of race discrimination in a failure to promote claim, Jackson must establish, by a preponderance of evidence, that he is a member of a protected class; he is qualified for the position; he was rejected for the position; and the position was given to a person outside the protected class who was similarly or less qualified than he. *Jordan v. City of Gary, Ind.*, 396 F.3d 825 (7th Cir. 2005). If the person who got the promotion was better qualified, the plaintiff's case fails.

Ultimately, this case rises or falls on the issue of similar qualifications. Jackson cannot prevail on a claim that he was similarly or better qualified to either Blake or O'Gorman. But, he says, they had an advantage in that they were given training opportunities which were denied to him as a result of discrimination.

The training opportunities, Jackson argues, involve an employee's being chosen to "act up." What that means is that an employee is given a chance to fill a higher position, often supervisory, for some period of time.

Through the acting-up process the employee receives training and experience that he would not otherwise have. Jackson says that the City discriminated against him on the basis of race by not allowing him to act up and thus put him at a disadvantage in the promotion process. Were it not for this discrimination, he says he would have qualifications similar to those of Blake and O'Gorman. The argument has some surface appeal, but it cannot be sustained.

In order to challenge an employment practice under Title VII, the employee must first file a charge with the Equal Employment Opportunity Commission. Depending on the state in which the charge is brought, it must be filed within 180 or 300 days. 42 U.S.C. § 2000e-5(e)(1). In this case, the limit is 300 days. The "acting-up" decisions were not part of Jackson's charge before the Equal Employment Opportunity Commission and, in fact, could not have been because they fell outside the 300-day time limit.

Jackson's theory is that the acting-up claims were not independent claims that had to be presented in an EEOC charge, but rather were offered to support his primary claim regarding discrimination in the promotion process. This theory has been foreclosed by the Supreme Court a number of times, recently and most emphatically in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007).[1]

---

[1] We are, of course, aware that the decision in *Ledbetter* has sparked significant controversy with critics vowing legislative

(continued...)

The line of cases culminating in *Ledbetter* begins with *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977), where a female flight attendant[2] was forced to resign because the airline did not employ *married* flight attendants, a practice now long, and wisely, abandoned. Ms. Evans was rehired some years later, but she was treated as a new employee for seniority purposes. She sued, arguing that the airline's refusal to give her credit for prior service gave "present effect to [its] past illegal act and thereby perpetuate[d] the consequences of forbidden discrimination." At 557. The Court rejected her argument, saying that the earlier discrimination did not constitute a present violation.

Similarly, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Court explained that the term "employment practice" generally refers to a "discrete act or single 'occurrence'" taking place at a particular time. At 110-11. Examples of such discrete acts are "termination, failure to promote, denial of transfer, [and] refusal to hire." At 114.

In *Ledbetter*, the Court extended the principle to claims involving discrimination in pay. The dissent

---

[1] (...continued)
action to reverse its holding. *See* www.thebusinessledger.com and the article posted there by Tim McLean on July 24, 2007.

[2] Until the 1970s, almost all "flight attendants" (a politically correct, gender-neutral term) were women, and they were, with few exceptions, called "stewardesses."

argued that the extension to pay discrimination went a step too far; that it was "a cramped interpretation of Title VII." The dissent looked to *Bazemore v. Friday*, 478 U.S. 385 (1986), which involved a situation where paychecks were issued pursuant to past discriminatory pay schedules—one for whites, one for African-Americans. The dual pay schedules were abandoned, but pay disparities attributable to the old dual pay schedules persisted. The *Bazemore* Court found that the past discrimination meant that the employer engaged in intentional discrimination each time it issued a paycheck in the present.

But rather than extending the *Bazemore* principle, the majority in *Ledbetter* relied on *Evans* and *Morgan*. Ledbetter was a salaried employee at a Goodyear plant where all such employees were given or denied pay raises based on performance evaluations completed by supervisors. She alleged that she was given sub-par evaluations in the past because of her sex and that her pay had not increased as much as it would have had she been fairly evaluated. The actual denials of pay raises (based on alleged discriminatory performance evaluations) were outside the limitations period, but she claimed that paychecks issued during the charging period were separate acts of discrimination. The Court rejected her claim, reaffirming the *Evans* line of cases: a "new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." At 2169.

Even if *Evans* and *Morgan* left any doubt, *Ledbetter* forecloses Jackson's claim. The acting-up decisions here

occurred outside the 300-day charging period. Jackson was not similarly qualified to Blake, especially considering his low score on the objective promotion test. Nor was he similar to O'Gorman who, like other applicants except Jackson, submitted a written work sample. The acting-up decisions were discrete acts which could be considered only if they occurred within the appropriate time period covered by his EEOC charge. It's true that, in certain situations, untimely actions can be used as "background evidence" to support a claim. *Evans*, *Morgan*, and *Fischer v. Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008). *Morgan* allows its use in certain hostile work environment cases. But its use here as "background evidence" would require a mini-trial: What were the available "acting-up" positions? Who applied? What were the qualifications of those who were accepted? How did they compare to Jackson? What skills were learned or enhanced by getting a chance to "act up"? How would those skills have better enhanced Jackson's chances of getting the positions that were given to Blake and O'Gorman? These are just a few of the issues that would have to be considered to even make the alleged "background evidence" relevant to the two positions Jackson sought but didn't get in 2004.

Finally, as the Court said in *Morgan*, at 113, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." A new violation does not occur "upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." *Ledbetter*, at 2169.

Accordingly, the judgment of the district court is AFFIRMED.